Christian F. WYLLER, Appellant,

v.

Donald MADSEN, Henry Wilde, Anita Wilde, and James Cummings, Appellees.

No. S–10224.

Supreme Court of Alaska.

May 9, 2003.

Philip M. Pallenberg, Batchelor, Pallenberg & Associates, Juneau, for Appellant.

Bernd C. Guetschow, Bernd C. Guetschow, A Professional Corporation, Anchorage, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and BRYNER, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Alaska Statute 32.05.330(b) permits a partner who has not wrongfully caused dissolution of a partnership to recover damages from each partner who has wrongfully caused the partnership to dissolve. Christian Wyller was a partner in a partnership which owned an office building in Juneau. He sought damages from other partners following the partnership's dissolution. The superior court, holding that Wyller's own wrongful acts had contributed to the dissolution, denied Wyller's claim for damages. We affirm, because we conclude that the superior court did not clearly err in finding that Wyller's acts contributed to the dissolution.

## II.   FACTS AND PROCEEDINGS

Christian Wyller was a partner in the Wildmeadow Village partnership. The partnership was formed in 1984 to manage Wildmeadow Village, a three-story office building in Juneau. As of 1984 the partnership consisted of Anita and Henry Wilde, Donald Madsen, Christian Wyller, and James Cummings.[1] The Wildes, Madsen, Wyller, and Cummings each owned a twenty-five percent interest in the partnership. The voting interests were aligned with the ownership interests, and the Wildes jointly held a single vote for management purposes. Madsen, Wyller, and Cummings were each entitled to a single vote.

Under difficult economic circumstances the partnership received an Invitation to Bid (ITB) from the State of Alaska in January 1991 to lease approximately 7,000 square feet of office space for five years. Madsen and Henry Wilde submitted a bid on the state ITB without procuring a majority vote of the partnership, and in violation of the partnership agreement. The state subsequently advised the partnership that it was the low bidder on the ITB.

The partners held a partnership meeting on February 10, 1991 to discuss the state ITB. At that meeting the partners approved the state lease and various improvements necessary to meet the bid specifications.[2]

The partnership's bid involved only portions of the second and third floors of its building. Madsen reported at the February 10 meeting that improvements of roughly $120,000 were necessary to meet the state bid—$70,000 for heating, ventilation, and air conditioning (HVAC) repairs, and some $50,000 for other tenant improvements.[3] Madsen explained that he prepared a loan package request for $120,000 to submit to the National Bank of Alaska (NBA) to finance the improvements. All four partners approved submission of the loan application. The application anticipated personal guarantees by the partners.

After the February 10 meeting, additional improvements beyond those required by the state lease were discussed by the Wildes, Madsen, and Wyller, but not approved. Time constraints prevented the partnership from finalizing the loan application before contracting for the work necessary to meet the state's bid specifications. Madsen retained a contractor, Holaday–Parks, Inc., to perform repairs on the building, and Madsen and Henry Wilde authorized work to the entire building, including repairs not necessary for the state lease and not properly approved by the partnership.[4] The total cost

1. The partnership formed in 1984 replaced a partnership that included each of these partners except Wyller.

2. The superior court concluded that Wyller and Cummings had ratified submission of the bid and approved the improvements necessary to meet the bid specifications after it found that neither Wyller nor Cummings objected "in any way" to the State of Alaska as a tenant, or "expressed any objection" to pursuing the financing necessary to pay for the improvements. On appeal Wyller does not dispute his approval of the bid, or of the improvements necessary for the state lease.

3. The amounts of Madsen's cost estimates to the partnership were disputed at trial. Wyller argues on appeal that Madsen told the partnership that Madsen estimated there would be $120,000 in necessary improvements—$70,000 for HVAC repairs and $50,000 for other work. Following the February 10, 1991 meeting Madsen estimated the total cost of improvements in a loan application as $157,000; at trial he suggested that his estimate to the partnership was greater than $140,000 ($70,000 for HVAC repairs and $71,000 for other improvements). The trial

court could not "verify the accuracy" of Wyller's claim that Madsen estimated $50,000 in non-HVAC improvements, but used this figure to conclude that Madsen's estimate to the partners was at least that much. The court found that Wyller agreed to the expenditure "of up to $120,000 for the improvements necessary to secure the state contract." We accept this finding because Wyller does not dispute on appeal that he authorized at least $120,000 in improvements necessary for the state lease.

4. The superior court found that Wyller approved the selection of Holaday–Parks as contractor either by telephone or by ratification because he knew of Holaday–Parks's proposal and did not object. Cummings was not involved in the decision to contract with Holaday–Parks, but the superior court found that once the partners gave unanimous approval to borrowing money for the necessary repairs, contracting for the work was a "management decision" under the partnership agreement, and could therefore be approved by a majority vote of the partners. We accept the superior court's finding that three of the four partners approved contracting with Holaday–

of repairs and improvements actually made to the building was $257,000. This significantly exceeded the estimated expenses discussed at the February 10 meeting, and the $120,000 loan package presented to the bank.

In mid-April 1991 NBA notified the partnership that NBA would not lend $120,000 to the partnership under the terms of the loan application. The bank refused to allow the partnership to borrow the money, and requested that the partners either individually or jointly provide collateral independent of the partnership. The partners did not contemplate a loan with the requirement of personal collateral when they approved and submitted the loan application.

In a meeting that began May 6, 1991 and continued on May 8 and May 23, 1991, the four partners discussed financing options in light of the bank's loan refusal. Wyller expressed reluctance to pledge cash or personal collateral for a loan, objected to substantial expenditures made without authorization, and said that he was at the limit of his resources.

The partnership meeting degenerated, and Wyller repeatedly voiced the opinion that the partnership was not authorized to pay the construction costs. On May 23 Wyller asked that management not "indulge[ ] in any excessive costs for anything on the building above the normal month-to-month expenses, the utilities and what have you." On appeal Wyller acknowledges that during the May meetings both he and Cummings "stated that they did not consider themselves responsible for the construction costs, since they had been incurred without authorization."

Madsen informed the partners that the bills needed to be paid, and told Wyller and Cummings that they were putting him in an "untenable position" by denying authorization to pay the construction costs. The construction bills were not paid, and Holaday–

Parks brought suit against Wildmeadow Village partnership, its individual partners, and various lienholders on the Wildmeadow Village building. The complaint spawned counter- and cross-claims by all four partners. The underlying claim by Holaday–Parks was settled shortly before trial, and the case was tried only on the cross-claims among the partners. After a bench trial in December 1992, then-Superior Court Judge Walter L. Carpeneti entered Findings of Fact, Conclusions of Law, and Orders dated August 13, 1993. Judge Carpeneti ruled on the various cross-claims, and ordered an accounting and winding up of the partnership. With minor exceptions, Judge Carpeneti denied motions for reconsideration from Wyller and Cummings on February 6, 1995.

The winding up process took some time, and the case was ultimately transferred to Superior Court Judge Patricia A. Collins. The partnership's only asset, the office building in Juneau, was eventually sold. Notwithstanding the extended and contentious litigation, Judge Collins found that after the sale there was, "remarkably, approximately $410,000 to be distributed to the partners, less their capital contributions."

Judge Collins entered an order regarding the distribution of partnership funds on December 14, 2000 and reconsidered certain factual issues related to the post-trial findings of Judge Carpeneti. Judge Collins then entered a final judgment May 5, 2001 from which Wyller now appeals.

The issues Wyller presents on appeal stem from Judge Carpeneti's 1993 findings of fact and conclusions of law. At trial Wyller argued that he was entitled to damages under AS 32.05.330(b)(1)(B), which gives partners who have not wrongfully caused dissolution of a partnership a cause of action for damages against each partner who has wrongfully caused dissolution.[5] Judge Carpeneti

---

Parks for the necessary repairs, which was sufficient under the partnership agreement at paragraph 19. Paragraph 19 of the partnership agreement provided that "[a] majority vote of the partners will be sufficient for approval" with respect to "[a]ll decisions affecting the partnership and its policies of management."

**5.** AS 32.05.330(b)(1)(B) provides:

(b) When dissolution is caused in contravention of the partnership agreement the rights of the partners are as follows:

(1) each partner who has not caused dissolution wrongfully has

. . . .

found Wyller "partially at fault for causing the dissolution of the partnership," and therefore concluded that Wyller was "not entitled to damages under the statute."

Wyller now appeals Judge Carpeneti's finding on the AS 32.05.330(b) claim, and asks that we remand for determination of his damages. Wyller also appeals Judge Carpeneti's determination that no party was the prevailing party for the purposes of awarding attorney's fees under Alaska Civil Rule 82.

## III. DISCUSSION

### A. Standard of Review

Alaska Civil Rule 52(a) provides that "[f]indings of fact shall not be set aside unless clearly erroneous." "A finding is clearly erroneous if it leaves this court with a definite and firm conviction on the entire record that a mistake has been made."[6] We apply a clearly erroneous standard of review to factual findings relating to the cause or causes of partnership dissolution under AS 32.05.330(b),[7] and take the view of the evidence most favorable to the prevailing party at trial.[8] To the extent Wyller's appeal involves mixed questions of law and fact, we will evaluate the legal questions separately, and apply our independent judgment adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[9]

### B. The Superior Court Did Not Clearly Err in Finding Wyller Partially at Fault for Dissolution of the Partnership.

In its August 13, 1993 conclusions of law the superior court stated that "[b]ecause the court has previously found that Cummings and Wyller were partially at fault for causing the dissolution of the partnership, they are not entitled to damages under [AS 32.05.330(b)]." The record suggests that the court's reference to its "previous findings"

referred to findings of fact Nos. 18 and 19 issued that same day. In Finding No. 18 the court observed that shortly following the bank's loan refusal, "Cummings and Wyller informed Madsen and Wilde that they did not consider themselves bound to provide financing for any of the improvements which by that time had been made to the property." In Finding No. 19 the court noted that "Cummings and Wyller refused to proceed with the loan application despite their approval of the state as a tenant, and despite their approval of submission of a loan package." The court continued in Finding No. 19, adding that "[t]heir later claims that the entire contract with Holaday–Parks was entered into without permission, or that the bank's financing requirements were somehow Madsen's fault, are not supported by the evidence."

In response to Wyller's allegation that the court did not explain why he was partially at fault for dissolution of the partnership, the court's December 8, 1994 order on reconsideration referred back to the substance of Findings Nos. 18 and 19. The court reiterated Finding No. 18, adding that Wyller and Cummings told Madsen and the Wildes that they did not consider themselves bound to provide financing for any of the improvements "without justification." The court also reiterated Finding No. 19, and stated that "Cummings and Wyller had refused to complete the loan application process despite having previously approved the State of Alaska as a tenant and the submission of the loan application."

On appeal Wyller selectively construes the court's findings. He suggests that the court found him partially responsible for dissolution, "based on the fact that [he] declined to put up his personal assets as collateral for a proposed loan." Proceeding from this characterization, Wyller urges the court to hold

(B) the right, as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement.

6. *City of Hydaburg v. Hydaburg Coop. Ass'n*, 858 P.2d 1131, 1135 (Alaska 1993) (quotation omitted).

7. *Schymanski v. Conventz*, 674 P.2d 281, 287 (Alaska 1983); *Geczy v. LaChappelle*, 636 P.2d 604, 606–07 (Alaska 1981).

8. *Geczy*, 636 P.2d at 606.

9. *Cockerham v. State*, 933 P.2d 537, 539 n. 9 (Alaska 1997) (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

as a matter of law that a partner is not obligated to pledge personal collateral to pay for partnership expenses.

Wyller's characterization of the court's findings is incomplete. It ignores the rationale set out in Finding No. 18—that he wrongfully denied responsibility for financing any of the improvements which by that time had been made to the building. Wyller does not deny that he disclaimed responsibility for the construction costs. In Wyller's own rendition of the facts on appeal he acknowledges that "[a]t the May 23, 1991 meeting, both [he and Cummings] stated that they did not consider themselves responsible for the construction costs, since they had been incurred without authorization." Wyller did not want the partnership to pay for any of the construction costs; he did not limit his objection to costs related to the unapproved improvements. This is clear from his expressed desire at that meeting that management not "indulge[ ]" in any excessive costs for anything on the building above the normal month-to-month expenses, the utilities and what have you." In Wyller's pretrial memorandum he explained that in the May 1991 meetings both he and Cummings "demanded that no further partnership funds be spent on the [Holaday–Parks] debt[ ]."

Wyller was not justified in preventing the partnership from paying for any of the improvements. Nor was he justified in denying personal or partnership responsibility for these costs. Madsen and Wilde may have bid on the state ITB in breach of the partnership agreement, but the superior court found that the partnership, including Wyller, subsequently ratified submission of the bid and the state lease, approved up to $120,000 in necessary improvements, approved submission of a loan application, and approved Holaday–Parks as a contractor. These approvals are not disputed on appeal. And given these approvals, Wyller could not then deny responsibility for the $120,000 in necessary improvements he authorized.

Wyller acknowledges on appeal that he authorized $120,000 in improvements, and that he later told the partnership he did not consider himself responsible for any construction costs. The fact that unauthorized improvements beyond those he approved were made to the building did not excuse him from responsibility for the improvements he did approve. The necessary improvements discussed in the February 10, 1991 meeting were properly approved and benefitted the partnership. Wyller had no reason to disclaim responsibility for them.

As Wyller observes on appeal, "[i]t is well established that, under the Uniform Partnership Act, partners are jointly liable for partnership obligations." [10] Wyller implies that he would be personally liable for his portion of the $120,000 only if the partners actually agreed to borrow $120,000 instead of simply filing a loan application. Under AS 32.05.100(a)(2), however, partners are liable for both the "debts and obligations" of the partnership. Wyller's argument seems to presume that "obligations" under AS 32.05.100 are restricted to actual bank loans. Wyller advances no argument that he was not liable for the obligations the partnership incurred in contracting to perform the approved repairs to the building.

Once the partnership authorized contracting with Holaday–Parks for the necessary improvements, neither the bank's subsequent loan refusal nor any subsequent breach by the partners excused Wyller from his obligations regarding his share of the $120,000. Wyller may have been excused from obligations stemming from the unauthorized portion of the repairs, but it is unnecessary for us to address that issue because Wyller disclaimed responsibility for the construction costs generally—not simply the unauthorized costs. Wyller fails to provide a justification for disclaiming responsibility for any of the

---

**10.** *See* AS 32.05.100 (establishing that all partners are jointly liable for contractual debts and obligations of a partnership). *See also* 1 WILLIAM MEADE FLETCHER ET AL, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 20 (perm.ed., rev. vol.1999) (observing that partners in a partnership are liable for the full extent of the indebtedness of the partnership, and that partners are individually entitled to the rights, and individually liable for the obligations, under contracts entered into by the partnership); 59A AM.JUR.2D *Partnership* § 639 (2002) (partners are jointly liable for all debts and obligation of partnership not arising from tort or breach of trust).

partnership's construction costs, or for preventing the partnership from making payment on any of the construction bills.

The superior court found that Wyller's unjustified denial of responsibility for construction costs wrongfully contributed to the dissolution of the partnership. Wyller wrongfully denied responsibility for any of the construction costs, and his denial of authorization to pay construction costs contributed to the course of events that precipitated the dissolution. Failure to pay construction costs brought about the Holaday–Parks suit, and that suit resulted in dissolution of the partnership. Determining the causes of dissolution is a factual inquiry, and Wyller does not establish that the superior court clearly erred in finding that his actions partially caused dissolution. Finding No. 18 justifies the court's conclusion that Wyller was ineligible for damages under AS 32.05.330(b).

Wyller indirectly suggests two possible theories under which his denial should have been excused. Neither is persuasive. First, Wyller contends that if he did have a duty to pursue financing through the bank after it rejected the terms of the loan application, his duty was excused by Madsen's breach in authorizing unapproved improvements to the building. This argument is unpersuasive because Madsen's breach in authorizing the unapproved work took place after Wyller and the partnership ratified the state lease and authorized $120,000 of necessary improvements. Madsen's breach may have excused Wyller from liability for the unauthorized portion of the repairs, but it was not a prior breach with respect to the improvements Wyller had previously authorized. Any breach by Madsen in authorizing unapproved repairs would not excuse Wyller from obligations flowing from the partnership's contract with Holaday–Parks to perform approved repairs.

Wyller's second potential justification for denying responsibility for the $120,000 in authorized repairs is implied in his conten-tion that the only reason the partnership needed a loan was to pay the unauthorized portion of the expenses. Wyller claims that the partnership paid for $106,000 in tenant improvements from its own resources without partner contributions, and argues that without Madsen's breach in authorizing unapproved repairs, the partnership would have either required a very small loan or no loan at all.

As discussed above, though, Wyller and the partnership approved $120,000 in improvements before Wyller wrongfully denied responsibility for any of the construction costs. The availability of $106,000 in partnership resources to pay construction costs is immaterial to Wyller's wrongful conduct. He did not merely refuse to pursue financing, he denied the partnership authority to pay the construction bills. And furthermore, whether that wrongful conduct contributed to the dissolution of the partnership is a factual inquiry reviewed under a clearly erroneous standard. Wyller fails to show that his conduct was not wrongful, or that it did not contribute to the dissolution of the partnership. Viewing the evidence in the light most favorable to the prevailing parties at trial, we conclude that the court did not clearly err in finding that Wyller's wrongful conduct contributed to the dissolution of the partnership.

Wyller's claims regarding available partnership resources are unpersuasive. Cash reserves sufficient to cover the cost of the approved repairs, assuming they were available, would not preclude a conclusion that Wyller's conduct wrongfully contributed to dissolution of the partnership. Wyller wrongfully prevented the partnership from paying the construction costs—irrespective of its available cash flow—and not paying construction costs spawned the Holaday–Parks suit and ultimately led to dissolution.[11] The record of the May 1991 partnership meeting demonstrates that it was Wyller's wrongful behavior that led Madsen and the Wildes to seek dissolution.[12] The trial court

---

11. Contrary to Wyller's supposition, the availability of cash reserves sufficient to cover a large portion of the approved repairs actually seems to reinforce the wrongfulness of his denial of part-nership authority to pay Holaday–Parks in the May 1991 meeting.

12. At the May 1991 meeting Madsen told Wyller and Cummings, "I would have to say that what

therefore did not clearly err in finding Wyller ineligible for damages under AS 32.05.330(b).[13]

Wyller spends the bulk of his appeal arguing as if the trial court found him ineligible for damages under AS 32.05.330(b) because he refused to pledge personal collateral for a partnership loan. He claims that his decision not to pledge personal collateral was a protected business judgment, and urges this court to hold that partners are not obligated to pledge personal collateral for partnership loans.

Wyller misreads the trial court's decision. The trial court did not find against him for failing to pledge personal collateral. The trial court did note in Finding No. 19, and then later on reconsideration, that Wyller refused to complete the loan application process despite his prior approval of the state lease and necessary repairs. The court also acknowledged that the partners did not contemplate the requirement of personal collateral in their loan application, and that the variance between the loan application and the bank's requirement of personal collateral was material. Nevertheless, these observations should not be viewed in isolation. We view Wyller's failure to cooperate in the financing process in the context already discussed—one in which he approved the state lease and the contract for the necessary repairs but declined responsibility for any of the construction costs. The court's observation regarding Wyller's refusal to participate in the financing process was shorthand for describing Wyller's denial of responsibility for any of the construction costs despite his prior approvals, and his refusal to allow the partnership to pay its bills.

It is not clear to us that the trial court actually presumed that Wyller had a duty to pledge personal collateral for a partnership loan,[14] but we need not speculate about the extent of Wyller's obligation to pursue financing. Finding No. 18 and the fact that Wyller denied responsibility for any of the construction costs in the May 1991 meeting are sufficient to prevent recovery under AS 32.05.330(b).

### C. Wyller Is Not Entitled to Rule 82 Attorney's Fees.

 Because the superior court did not reversibly err in finding Wyller ineligible for damages under AS 32.05.330(b), he was not the prevailing party at trial and therefore is not entitled to attorney's fees under Alaska Civil Rule 82.

## IV. CONCLUSION

We therefore AFFIRM the judgment below.

CARPENETI, Justice, not participating.

---

you two fellas are doing is putting me in an untenable position.... [T]he bills need to be paid, and if you're putting me in that untenable position of where the bills are not going to now be paid, it's probably time that we got the judge and the jury involved and got it resolved once and for all, and I'll move for dissolutionment of the partnership and I'll so proceed legally to do that." Madsen and the Wildes ultimately sought legal dissolution of the partnership.

13. Madsen and the Wildes each paid $68,000 and Wyller paid $10,000 to Holaday–Parks to settle the contractor's claims against the partnership. The fact that Wyller paid $10,000 in the settlement does not affect our analysis. Even if Wyller's $10,000 payment covered his share of the balance between payments made to Holaday–Parks from partnership resources and the $120,000 the partners authorized for improve-ments, the settlement payment was made subsequent to Wyller's wrongful conduct, the filing of the Holaday–Parks suit, and the chain of events that the trial court found led to dissolution. The settlement payment therefore need not bear on whether Wyller contributed to the dissolution of the partnership.

14. After observing that the variance between the partnership's loan application and the bank's requirement for personal collateral was material, the court noted that "the failure of Madsen to obtain the most favorable terms from the bank did not excuse Cummings and Wyller from their obligation to cooperate with the partnership efforts to locate financing for the project." We agree with the court's assessment, and believe it falls short of finding Wyller had a duty to pledge personal collateral for a partnership loan.